UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HARRY HARRISON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:19-cv-02173-TWP-MPB |
| ) | |
| MURAT POLAR, RACHAEL HOUGHTON, ) | |
| CHASSITY[1] PLUMMER-LONG, PAMELA ) | |
| JOHNSON, REBECCA TRIVETT, and ) | |
| TRICIA PRETORIOUS, *Warden* ) | |
| ) | |
| Defendants. ) | |

## ORDER GRANTING MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the Defendant's Motion for Summary Judgment, filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Dr. Murat Polar ("Dr. Polar"), Pamela Johnson, Chassity Plummer-Long, and Rebecca Trivett ("Ms. Trivett") (collectively the "Medical Defendants"). Plaintiff Harry Harrison ("Mr. Harrison") brings this civil rights suit under 42 U.S.C. § 1983 alleging that Medical Defendants were deliberately indifferent to his serious medical needs and committed medical malpractice.[2] (Dkt. 166.) In his response, Mr. Harrison requests the dismissal of claims against Ms. Trivett.[3] Accordingly, all claims against Ms. Trivett are **dismissed**. Additionally, the undisputed evidence shows that the remaining Medical Defendants exercised reasonable medical judgment in response to Mr. Harrison's complaints and

---

[1] Defendant Plummer-Long's first name was also incorrectly spelled by Plaintiff; Defendant's name is spelled Chassity and her last name is now Plummer-Long (*see* Dkt. 169-5 at 6). The **clerk is directed** to make this change to the docket.

[2] Mr. Harrison also asserts claims against former Plainfield Correctional Facility warden Stanley Knight. The Court addressed Warden Knight's Motion for Summary Judgment, (Dkt. 162), separately, (Dkt. 198).

[3] Mr. Harrison writes "I am asking the Court to dismiss this action against Rebecca Trivett due to the Plainfield Correctional Facility lost the medical records that I needed to prove my case. (Dkt. 192 at 7).

that none committed medical malpractice. Accordingly, the Motion for Summary Judgment must be **granted**.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

The court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II.  FACTS

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Mr. Harrison as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     The Parties**

Mr. Harrison is an Indiana Department of Correction ("IDOC") inmate incarcerated at the Plainfield Correctional Facility ("PCF") since November 14, 2017.

Dr. Polar is a physician who was employed by Wexford of Indiana, LLC ("Wexford") at PCF from April 1, 2017 through October 5, 2018. (Dkt. 169-1 at ¶¶ 1−2.)

Pamela Johnson (Nurse Johnson") is a nurse practitioner employed by Wexford at PCF from April 1, 2017 through February 2, 2018. (Dkt. 169-2 at ¶¶ 1−2.)

Rachel Houghton ("Ms. Houghton") is a registered nurse employed by Wexford at PFC since April 1, 2017. (Dkt. 169-4 at ¶¶ 1−2.) She served as the Health Services Administrator ("HSA") at PCF until September 30, 2019, when her role changed to Regional Manager. *Id.* The HSA is an administrative role, and Ms. Houghton's responsibilities included overseeing the provision of medical services inside PCF, ensuring compliance with IDOC healthcare services directives, responding to requests for information, and evaluating and responding to grievances by inmates. *Id.* at ¶ 3.  Ms. Houghton did not provide patient care, nor could she order specific treatment or prescribe medications. *Id.* at ¶¶ 4−5.

3

Chassity Plummer-Long ("Ms. Plummer-Long") is a registered nurse employed by Wexford. Dkt. 169-5 at ¶¶ 1–2. She was the Director of Nursing until October 2019, when she became the HSA. *Id.* at ¶ 2. Similar to the HSA, her job duties as the Director of Nursing were primarily administrative, although she had some direct patient contact. *Id.* at ¶ 3. She supervised nursing services, responded to certain requests and letters sent to the healthcare unit, responded to informal grievances, and performed other tasks as requested by the HSA or a doctor. *Id.*

### B. Mr. Harrison's Medical Care

Mr. Harrison suffers from several chronic medical conditions including degenerative disc disease, sciatica, and related pain.[4] Dkt. 52 at 2. Due to the nature of his conditions, he has had numerous interactions with the Medical Defendants and other medical professionals. The Court need not discuss every medical appointment but rather summarizes the course of treatment and related issues as needed. Specifically, the Court does not include details of Mr. Harrison's prescriptions or care that do not relate to the amended complaint.

#### 1. Treatment in 2017

Before his transfer to PCF, Mr. Harrison was treated at the Reception and Diagnostic Center, where he was prescribed acetaminophen, Cymbalta (an antidepressant), and Meloxicam (a pain reliever). (Dkt. 169-7 at 141.) Upon his intake at PCF on November 15, 2017, he was admitted into the infirmary, and it was noted that Mr. Harrison could not walk or care for himself in general population. *Id.* at 146. An x-ray of his spine was ordered, and prescriptions for the three medications were renewed. *Id.* at 146–49. The x-ray showed mild to moderate degenerative disc disease as well as degenerative changes at three vertebrae. *Id.* at 145.

---

[4] Mr. Harrison's Amended Complaint also mentions mental health issues and epilepsy, but as the case has developed it has become clear that Mr. Harrison challenges the treatment for his back condition and chronic pain. *See*, e.g., Dkt. 191 at 3.

On November 16, 2017, Dr. Polar added additional pain medications to Mr. Harrison's drug regimen, specifically Tylenol 3, Neurontin, and a Toradol injection, as well as Prednisone (a steroid). Dkt. 169-1 at ¶¶ 10-11.

Nurse Johnson saw Mr. Harrison on November 17, 2017. They discussed his x-ray results, and Nurse Johnson reviewed the pain medications prescribed by Dr. Polar. (Dkt. 169-2 at ¶ 7.) Because both Tylenol 3 and Neurontin are potentially habit-forming, Nurse Johnson declined to prescribe Mr. Harrison additional pain medications but advised him he could purchase more from commissary. *Id.*

On November 21, 2017, Dr. Polar submitted a request for Mr. Harrison to receive an off-site orthopedic spine visit, due to immobility and complaints of severe pain. (Dkt. 169-1 at ¶ 12.) On November 27, 2017, he referred Mr. Harrison for a physical therapy consult. *Id.* at ¶ 14.

Mr. Harrison had his first physical therapy assessment with physical therapist Dana Miller on December 1, 2017. (Dkt. 169-7 at 163.) She determined that due to his pain and the ineffectiveness of previous physical therapy sessions, he was not a good candidate for physical therapy. *Id.*

Dr. Polar saw Mr. Harrison for three visits in December, where he continued Mr. Harrison's pain medications and other prescriptions. (Dkt. 169-1 at ¶¶ 16–17, 19.) On December 20, 2017, Dr. Polar submitted a request for Mr. Harrison to receive a lumbar MRI. *Id.* at ¶ 18.

Mr. Harrison alleges that he did not consistently receive his prescribed medications in November and December. Dkt. 169-6 at 8 (Harrison Depo. 27:19–24, 28:5–24), *Id*. at 12 (43:3–9). Dr. Polar's notes from that timeframe do not reflect that Mr. Harrison ever complained about missed medications. (Dkt. 169-7 at 157–78; Dkt. 169-1 at ¶ 45.) Likewise, Ms. Houghton also reviewed Mr. Harrison's medication administration records which showed Mr. Harrison was always receiving

5

medications. (Dkt. 169-4 at ¶ 20.) Ms. Houghton was never made aware of any problems related to Mr. Harrison's receipt of medications. *Id.*

### 2. Treatment in 2018

Nurse Johnson was contacted by nursing staff on January 2, 2018, due to Mr. Harrison's complaints of pain. (Dkt. 169-2 at ¶ 9.) She reviewed his records, and given the high quantity of pain medication prescribed by Dr. Polar—including a controlled substance (Tylenol 3) provided every six hours—she declined to prescribe additional medication. *Id.* She then saw Mr. Harrison for a visit on January 4, 2018, where they discussed the discontinuation of Cymbalta and the impact it may have on Mr. Harrison's emotional status. *Id.* at ¶ 10. Mr. Harrison did not appear to be in significant pain, and Nurse Johnson saw no need to change the pain medications that Dr. Polar had prescribed. *Id.* That was Nurse Johnson's last visit with Mr. Harrison, though she may have seen him while doing rounds in the infirmary. *Id.* at ¶ 11. Nurse Johnson believed that any changes to Mr. Harrison's pain medications should be made by Dr. Polar since he was Mr. Harrison's primary care provider at that time. *Id.* at ¶ 16.

Mr. Harrison received an MRI on January 8, 2018. (Dkt. 169-7 at 16.) The MRI revealed mild grade 1 or grade 2 spondylolisthesis[5] of a vertebra, as well as multi-level degenerative changes and disc herniations with bulging and facet hypertrophy at multiple levels. *Id.* The assessment was "multi-level degenerative changes as described." *Id.* Based on the number of abnormalities reflected in the MRI and Mr. Harrison's continued pain and difficulty walking, Dr. Polar submitted another referral for Mr. Harrison to be seen by a neurosurgeon. (Dkt. 169-1 at ¶¶ 20-21.)

---

[5] "Spondylolisthesis is a spinal condition that causes lower back pain. It occurs when one of your vertebrae … slips out of place onto the vertebra below it." *Cleveland Clinic*, "Spondylolisthesis," https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis (last reviewed Aug. 7, 2020).

Dr. Polar discussed the MRI findings with Mr. Harrison at a January 11, 2018 appointment. *Id.* at ¶ 22. Mr. Harrison reported ongoing pain and decreased range of motion. *Id.* Dr. Polar ensured Mr. Harrison he would continue to have Toradol injections, Meloxicam, and Neurontin, and he replaced the Tylenol 3 with Norco, an opioid pain medication. *Id.* At their next visit, Mr. Harrison reported that the Norco decreased his pain. *Id.* at ¶ 23.

On February 2, 2018, Mr. Harrison had an assessment with neurosurgeon David Stockwell ("Dr. Stockwell"). (Dkt. 169-7 at 51, 55.) Dr. Stockwell conducted a physical assessment of Mr. Harrison and reviewed his imaging. *Id*. Dr. Stockwell's notes stated, "With his fluctuating pain, numbness and weakness in all four extremities, I do not have a great explanation for this and I do not think this is fully explainable by what is identified in his lumbar spine." *Id.* at 55.  He recommended a potential neurology consultation with an Electromyography ("EMG") nerve conduction study of the upper and lower extremities to address the neurological symptoms, a bone density scan of the hip, and an orthopedic evaluation of the hips. *Id.* Dr. Stockwell did not think spine surgery would resolve or even alleviate his issues. *Id.*

Upon reviewing Dr. Stockwell's notes, Dr. Polar submitted recommendations for Mr. Harrison to receive a bone density scan, an EMG, and an appointment with an orthopedic specialist. (Dkt. 169-1 at ¶ 25.) Mr. Harrison received the bone density scan on February 12, 2018, which was normal (indicating a low fracture risk). *Id.* at ¶ 26. On February 19, 2018, he was assessed by an orthopedic specialist regarding his hip. (Dkt. 169-7 at 58.)  The specialist did not recommend hip surgery but thought lumbar decompression surgery with a fusion of certain vertebrae should be considered. *Id.*; Dkt. 169-1 at ¶ 27.

Based on the orthopedic specialist's findings, Dr. Polar requested that Mr. Harrison be referred back to a surgeon for consideration of lumbar fusion surgery. *Id.* at ¶ 28. Dr. Polar next

saw Mr. Harrison on March 5, 2018, and they discussed the specialists' recommendations. *Id.* at ¶ 29. The plan was to first complete the EMG and then make referrals for potential surgical consultation. *Id.* Dr. Polar continued Mr. Harrison's Meloxicam, Neurontin, and Tylenol 3 prescriptions (the Norco prescription having expired on March 1, 2018). *Id.* at ¶ 29.

On March 23, 2018, Mr. Harrison received an EMG from neurologist Dr. Gary Rusk. (Dkt. 169-7 at 85−87.) The study was considered abnormal showing generalized peripheral neuropathy but no evidence of lumbar radiculopathy.[6] *Id.*; Dkt. 169-1 at ¶ 30.

Dr. Polar and Mr. Harrison agreed that his condition could be managed in a specialized general population setting, so Mr. Harrison was discharged from the infirmary on March 26. Dkt. 169-1 at ¶ 31. Dr. Polar ordered that Mr. Harrison receive a bottom bunk pass and a wheelchair and continued Mr. Harrison's prescriptions for pain medications. *Id.*

Mr. Harrison was dissatisfied with the pain medication he was receiving, so he filed a grievance in April. (Dkt. 169-8 at 7; Dkt. 192-1 at 107.) Ms. Houghton reviewed Mr. Harrison's medical records and met with him face-to-face. (Dkt. 169-4 at ¶ 9.) She noted Mr. Harrison had active prescriptions for Tylenol 3, Neurontin, and Meloxicam to address his pain, and he acknowledged that his pain would most likely never be completely eliminated. *Id.* They also discussed his upcoming consultation with Dr. Stockwell and that they would determine the best plan of care after that visit. *Id.*, Dkt. 169-8 at 7. Accordingly, the grievance was denied. (Dkt. 169-4 at ¶ 10.)

Mr. Harrison returned to neurosurgeon Dr. Stockwell on April 17, 2018, and Dr. Stockwell reviewed the other specialists' findings. (Dkt. 169-7 at 96.) He noted that Mr. Harrison did not have

---

[6] "Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column. … Symptoms of radiculopathy vary by location but frequently include pain, weakness, numbness and tingling." *John Hopkins Medicine*, "Radiculopathy," https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Sept. 15, 2021).

weakness in his limbs like he had during their previous examination and noted the lack of active hip issues. *Id.* He recommended that Mr. Harrison receive back injections, but "[g]iven his changing neurologic exam, it is hard to know if surgery will ever be of benefit to him." *Id.* If Mr. Harrison did not receive any benefit from the injections, Dr. Stockwell recommended medical management. *Id.* Based on this visit, Dr. Polar requested that Mr. Harrison be sent for a back injection. (Dkt. 169-1 at ¶ 33.)

Mr. Harrison was supposed to receive a back injection on May 22, 2018 at Indiana University West Neurosurgery, but the injection did not go as scheduled. *Id.* at ¶ 34. According to an email chain that included Dr. Polar, Ms. Houghton, and Ms. Plummer-Long, the medical providers at Indiana University West Neurosurgery ordered Mr. Harrison to receive Prednisone and Benadryl the night before his injection due to a fish allergy. Dkt. 169-8 at 3. But allergy tests revealed that Mr. Harrison did not have a fish allergy, so the medication was not provided. (Dkt. 169-4 at ¶ 12.) Because the off-site provider was unaware that Mr. Harrison did not have a fish allergy, they refused to provide the injection. *Id.* Ultimately, the appointment was rescheduled, and Mr. Harrison received the injection on June 8, 2018. (Dkt. 169-7 at 113.)

Based on Dr. Polar's referral, Mr. Harrison saw Dr. Stockwell on June 29, 2018 for a follow-up appointment. (Dkt. 169-1 at ¶ 37.) Dr. Stockwell conducted a physical examination and reviewed the notes and records. (Dkt. 169-7 at 122.) He recommended physical therapy for low back pain and core strengthening, medical pain management, and to consider another neurology evaluation for pseudoseizures or other possible causes of his movement disorders. *Id.*

Based on Dr. Stockwell's recommendation, Dr. Polar referred Mr. Harrison to physical therapy, which he received on July 18 and August 1, 2018. (Dkt. 169-1 at ¶¶ 38, 39.) Mr. Harrison

9

testified that Ms. Houghton did not think he needed physical therapy, but any disagreement she had did not prevent him from receiving it. (Dkt. 169-6 at 17 (Harrison Depo. 64:7−22, 65:2).)

Dr. Polar's last visit with Mr. Harrison was on September 11, 2018. (Dkt. 169-1 at ¶ 40.) Dr. Polar increased Mr. Harrison's Neurontin prescription based on Mr. Harrison's report of discomfort and also continued his Meloxicam prescription. *Id.* He also renewed Mr. Harrison's permits for a bottom bunk, wheelchair, walker, and wedge pillow. *Id.*

In December, Ms. Houghton was contacted by IDOC grievance staff about a grievance Mr. Harrison had filed concerning damaged sidewalks and the condition of his wheelchair. (Dkt. 169-4 at ¶ 14.) Ms. Houghton responded that Mr. Harrison had recently discussed the cracked sidewalks at visits with a nurse and his provider, and Mr. Harrison had advised the provider that he planned to speak with the warden. (Dkt. 169-8 at 1.) The provider noted that Mr. Harrison was on Meloxicam and Neurontin. *Id.* Further, it was noted that Mr. Harrison's wheelchair had been replaced three times, and staff would continue to ensure his wheelchair was in a safe condition. *Id.* Neither Ms. Houghton nor Ms. Plummer-Long can do anything about damaged sidewalks at PCF, but they both advised Mr. Harrison to move slowly and carefully on the sidewalks to avoid injury. (Dkt. 169-4 at ¶ 18; Dkt. 169-5 at ¶ 17.)

### 3. **Miscellaneous Issues**

Ms. Plummer-Long was contacted by IDOC grievance staff in October 2019 after Mr. Harrison submitted another grievance about his wheelchair. (Dkt. 169-5 at ¶ 14.) Ms. Plummer-Long told the grievance specialist that a new wheelchair had been ordered, but she was not sure when Mr. Harrison would receive it because it first had to be cleared by the maintenance department. *Id.* She provided the same information to Mr. Harrison. *Id.* Mr. Harrison was never

injured by having to use an older or broken wheelchair. (Dkt. 169-6 at 25 (Harrison Depo. 96:8−10).)

At some point, Mr. Harrison's prescription for Neurontin was discontinued after a test showed low therapeutic levels in his system, indicating that he was not taking the medication as prescribed. *Id.* at 27−28 (104:21−22, 105:2−16, 106:3−15). Mr. Harrison believes that Ms. Plummer-Long directed the discontinuation of his Neurontin based on her position as the HSA and the fact that she told him about the discontinuation. *Id.* at 28 (107:2−22). But as a nurse, Ms. Plummer-Long had no authority to order or discontinue a patient's Neurontin; it must be ordered by a physician. (Dkt. 169-5 at ¶ 15.) Ms. Plummer-Long discussed Mr. Harrison's Neurontin prescription with him, but she does not recall being involved in the decision-making process about whether he should receive it. *Id.*

Mr. Harrison alleged there was a two-week period in 2018 after his move from the infirmary to a dorm in which he was unable to shower because the handicap-accessible shower in his housing unit was broken. He alleged that neither Ms. Houghton nor Ms. Plummer-Long would allow him to use the shower in the infirmary. (Dkt. 169-6 at 20 (Harrison Depo. 75:6−24, 76:1−22).) Mr. Harrison submitted a healthcare request form to Ms. Houghton about the shower being broken. *Id.* at 20 (76:11−13). Ms. Houghton confirmed that the shower in the dorm was not working. *Id.* at 20 (76:23−24−77:1−12). But there was still some time between when she learned that and when she acted to help Mr. Harrison obtain a shower. *Id.* at 21 (78:1−8). As a result of not showering for two weeks, Mr. Harrison was "filthy" and "humiliated." *Id.* at 21 (80:8, 21).

Ms. Plummer-Long and Ms. Houghton acknowledged that inmates are sometimes allowed to use the shower in the infirmary if the shower in their housing unit is down for maintenance. (Dkt. 169-5 at ¶ 18; Dkt. 169-4 at ¶ 21.) They had no knowledge of Mr. Harrison suffering an injury,

11

disease, infection, or abnormality as a result of his lack of access to a shower, nor did they recall him ever going a long period of time without shower access. (Dkt. 169-5 at ¶ 19; dkt. 169-4 at ¶ 21.)[7]

Mr. Harrison relied on a portable urinal, and he alleged that Ms. Plummer-Long changed an order for him to receive a replacement urinal only once per month rather than every two weeks. (Dkt. 169-6 at 30 (116:8−16).) Ms. Plummer-Long is not responsible for ordering medical supplies but does assist with disbursement. (Dkt. 169-5 at ¶ 20.) She was not aware of any time that Mr. Harrison did not have access to a urinal. *Id*. Mr. Harrison says the problem with receiving a urinal only once a month is that it is less clean. (Dkt. 169-6 at 20 (117:11−14).)

### III.  ANALYSIS

Mr. Harrison argues that the Medical Defendants were deliberately indifferent to his serious medical needs and engaged in medical malpractice.

**A.  Eighth Amendment**

"Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The deliberate indifference "standard encompasses both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021) (internal quotation omitted).

---

[7] Mr. Harrison's designated evidence shows that he could not shower for approximately ten days in March 2020. (Dkt. 192-1 at 35, 48, 173, 205−07.) But Mr. Harrison's Amended Complaint was filed on December 20, 2019, and he did not move to supplement his complaint to add the March 2020 issue. Fed. R. Civ. P. 15(d). Thus, the Medical Defendants did not have an opportunity to respond to allegations about this timeframe.

As to the first element, a "medical condition is serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Perry*, 990 F.3d at 511 (cleaned up).

"The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up). A defendant must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). In other words, "deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). It "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources*, 982 F.3d 451, 458 (7th Cir. 2021) (cleaned up).

The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

The Medical Defendants do not dispute that Mr. Harrison suffers from serious medical conditions. Thus, the only issue is whether they were deliberately indifferent through their actions or inaction.

### 1. **Dr. Polar**

The Court examines the totality of Mr. Harrison's medical care when evaluating whether Dr. Polar was deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

Dr. Polar provided extensive medical care to Mr. Harrison. He provided various types of pain medication and steroids to address Mr. Harrison's complaints of pain, and he adjusted their dosages based on Mr. Harrison's feedback. He also ordered permits for Mr. Harrison to have a wheelchair, walker, lower bunk pass, and a wedge pillow. Recognizing the gravity of Mr. Harrison's issues, Dr. Polar referred Mr. Harrison to neurosurgeon Dr. Stockwell, and pursuant to his recommendation, requested referrals for a bone density scan, a consultation with an orthopedic specialist, and a consultation with a neurologist to conduct a nerve conduction study. Dr. Polar then sent Mr. Harrison back to Dr. Stockwell for two further assessments.

Mr. Harrison may want to have surgery on his back, but he has no constitutional right to demand specific care. *Arnett*, 658 F.3d at 754. Dr. Polar did not have the authority to order surgery; he could only make referrals to specialists, which he did. (Dkt. 169-1 at ¶ 43.) Dr. Stockwell did not consider Mr. Harrison a good candidate for surgery, but based on Dr. Stockwell's recommendation, Dr. Polar attempted to manage Mr. Harrison's pain through medication and referrals to physical therapy. Mere disagreement with Dr. Polar's treatment decisions is not enough to establish deliberate indifference. *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021).

Further, Dr. Polar was not deliberately indifferent for failing to remediate the sidewalks. The undisputed record shows that IDOC staff, not the Medical Defendants, are responsible for maintaining and repairing the sidewalks at PCF. Indeed, Mr. Harrison's claim for injunctive relief

as it relates to the condition of the sidewalks survived summary judgment and is proceeding against Warden Pretorius.  (Dkt. 198.)

There is no dispute that Mr. Harrison's condition causes him chronic pain.  But the fact that he still suffers from pain due to his chronic condition does not indicate that Dr. Polar was deliberately indifferent.  *See Leiser v. Hoffman*, --- F. App'x ---, 2021 WL 3028147, *3 (7th Cir. July 19, 2021) ("[D]octors are not deliberately indifferent when they are unable to eliminate completely a patient's pain.") (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Dr. Polar's consistently responsive care does not support a claim of deliberate indifference.  Because no reasonable jury could find that Dr. Polar was deliberately indifferent to Mr. Harrison's chronic conditions, summary judgment must be **granted** in his favor.

### 2. Nurse Johnson

Nurse Johnson had only two appointments with Mr. Harrison in between his visits with Dr. Polar.  Dr. Polar had prescribed Mr. Harrison several types of pain medication in relatively large doses.  In Nurse Johnson's medical judgment, additional pain medication was not necessary.  Further, she believed any decisions about Mr. Harrison's pain medication should be made by Dr. Polar, who was primarily managing Mr. Harrison's care. As a nurse, she was entitled to defer to Dr. Polar's decisions about pain medication.  *McCann v. Ogle Co., Ill.*, 909 F.3d 881, 887 (7th Cir. 2018) (noting that nurses may rely on a physician to determine proper dosage of pain medication as long as it is not obvious that the doctor's decision will harm patient). Because no reasonable juror could find that Nurse Johnson was deliberately indifferent to Mr. Harrison, summary judgment must be **granted** in her favor.

### 3. Ms. Houghton

Ms. Houghton's role at PCF was that of an administrator—not a treating nurse. She could not prescribe medication or order specific treatment. Rather, her duty was to respond to Mr. Harrison's grievances, which she did by evaluating his records and meeting with him to discuss his treatment plan.

Ms. Houghton also responded to concerns about Mr. Harrison's wheelchair by ensuring Mr. Harrison's wheelchair was replaced as needed and was otherwise in working order. Like the other Medical Defendants, she had no control over the condition of the sidewalks, which was the principal source of Mr. Harrison's concern. Further, even assuming that Mr. Harrison's wheelchairs were designed for indoor use and had some problems, he was never injured using one. (Dkt. 169-6 at 25 (96:8−10); *see also*, Dkt. 161 at 4 (order denying motion for preliminary injunction asking for replacement wheelchair, where Court's review of video showed Mr. Harrison moving through a hallway in the wheelchair without difficulty).)

Mr. Harrison alleges that Ms. Houghton was responsible for the delay in his off-site back injection. Ms. Houghton did not have the authority to provide or deny Mr. Harrison the pre-procedure medications, but her review of the email exchange indicated those medications were not needed due to the lack of fish allergy. (Dkt. 164-4 at ¶ 17.) Thus, there is no evidence that Ms. Houghton was responsible for the mix-up that resulted in his appointment being rescheduled. Regardless, Mr. Harrison was able to receive the injection less than two weeks later.

Mr. Harrison also blames Ms. Houghton for not providing him access to a shower for two weeks in 2018. Access to facilities to bathe "are among the minimal civilized measure of life's necessities" that must be afforded to inmates under the Eighth Amendment. *Jaros v. Ill. Dept. of Corrections*, 684 F.3d 667, 670 (7th. Cir. 2012) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Ms. Houghton testified that she was not aware that Mr. Harrison ever lacked shower

access for an extended period of time. (Dkt. 169-4 at ¶ 21.) Mr. Harrison testified that—at *some point* within the two-week period—he alerted Ms. Houghton to the issue, she confirmed that the dorm shower was broken, and she did not act immediately to remedy the situation. (Dkt. 169-6 at 20−21 (Harrison Depo. at 76−78).) But a temporary denial of shower facilities does not rise to a constitutional violation. *See Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014); and *Jaros*, 684 F.3d at 670 ("[L]imiting inmates to weekly showers does not violate the Eighth Amendment."). Given Mr. Harrison's vague testimony and absence of evidence showing that Ms. Houghton ignored his complaint for more than a week, Mr. Harrison has not provided evidence from which a factfinder could infer that Ms. Houghton was deliberately indifferent to his lack of shower access. *See Conner v. Hoem*, 768 F. App'x 560, 565 (7th Cir. 2019) (assuming cell was indeed cold, there was insufficient evidence that prison staff was aware of the temperature and disregarded a serious risk of harm).[8]

Accordingly, there is no evidence that Ms. Houghton failed to act upon learning about Mr. Harrison's concerns about his wheelchair or medical care; nor was she responsible for making decisions about Mr. Harrison's medical care. *Donald*, 982 F.3d at 458; *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (concluding health services manager was not deliberately indifferent where she responded to complaints about his health care but was not directly involved in his treatment). Although a temporary lack of showers was unfortunate, Ms. Houghton's action or inaction did not rise to a constitutional violation. Because no reasonable

---

[8] Seventh Circuit precedent is clear that providing access to showers once a week does not violate the Eighth Amendment. *See Jaros*, 684 F.3d at 670, *and Vasquez v. Braemer*, 586 F. App'x 224, 228 (7th Cir. 2014) (citing *Hardaway v. Meyerhoff*, 734 F.3d 740, 744−45 (7th Cir. 2013), and *Henderson v. Lane*, 979 F.2d 466, 468−69 (7th Cir. 1992). The Court need not decide how many showerless days are required to trigger an Eighth Amendment violation, given the lack of evidence showing Ms. Houghton was deliberately indifferent.

juror could find that Ms. Houghton was deliberately indifferent to Mr. Harrison, summary judgment must be **granted** in her favor.

### 4. Ms. Plummer-Long

Most of Mr. Harrison's claims against Ms. Plummer-Long overlap with his claims against Ms. Houghton and fail for the same reasons. Like Ms. Houghton, Ms. Plummer-Long was in an administrative role and had no authority to order or change his prescriptions, provide him potentially unnecessary medication in preparation for an off-site injection, or fix the sidewalks. Ms. Plummer-Long addressed Mr. Harrison's concerns about his wheelchair by meeting with him and advising him that a new one had been ordered but was being inspected by maintenance. Ms. Plummer-Long did not know that Mr. Harrison could not shower for two weeks, and she did not know of a time where he did not have access to a portable urinal. Because no reasonable juror could find that Ms. Plummer-Long was deliberately indifferent to Mr. Harrison, summary judgment must be **granted** in her favor.

### B. Medical Malpractice

To make a successful negligence claim, a plaintiff must establish: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) any injury proximately caused by the breach of that duty. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind. 1991). In the context of professional malpractice, he must also show that the breach of any duty was caused by the defendant allowing their care and treatment to fall below a set standard of care. *Perry v. Driehorst,* 808 N.E.2d 765, 768 (Ind. Ct. App. 2004). The standard of care is defined as "that degree of skill and care ordinarily possessed and exercised by a reasonably careful, skillful and prudent

practitioner in the same class to which he/she belongs treating such formalities under the same or similar circumstances." *Id.*

In the case of professional malpractice, the plaintiff must usually provide expert testimony. *Id.; see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 753 (7th Cir. 2004) ("[U]nder Indiana law a prima facie case in medical malpractice cannot be established without expert medical testimony."). "This is generally so because the technical and complicated nature of medical treatment makes it impossible for a trier of fact to apply the standard of care without the benefit of expert opinion on the ultimate question of breach of duty." *Bader v. Johnson*, 732 N.E.2d 1212, 1217−18 (Ind. 2000). Therefore, "Indiana's common law of medical malpractice requires a plaintiff to present expert evidence of the applicable standard of medical care unless the defendant's conduct is 'understandable without extensive technical input' or 'so obviously substandard that one need not possess medical expertise to recognize the breach.'" *Gipson v. United States*, 631 F.3d 448, 451 (7th Cir. 2011) (quoting *Narducci v. Tedrow*, 736 N.E.2d 1288, 1293 (Ind. Ct. App. 2000)). If the plaintiff fails to provide such evidence, "there is no triable issue," and the defendant is entitled to summary judgment. *Culbertson v. Mernitz*, 602 N.E.2d 98, 104 (Ind. 1992).

Mr. Harrison did not provide any evidence to establish the applicable standard of care for his conditions or deviation from that standard of care. Accordingly, summary judgment must be **granted** as to all the Medical Defendants on the medical malpractice claims.

### IV. <u>CONCLUSION</u>

Mr. Harrison has voluntarily dismissed his claims against Rebecca Trivett. The Medical Defendants' Motion for Summary Judgment, Dkt. [166], is **GRANTED**, and all claims against

Murat Polar, Rachel Houghton, Chassity Plummer-Long, and Pamela Johnson are **dismissed with prejudice**.

The Court previously denied summary judgment against the warden on Mr. Harrison's claim for injunctive relief with respect to PCF's damaged sidewalks. (Dkt. 198.) Accordingly, because that claim has not yet been resolved, no final judgment shall issue at this time.

The **Clerk is directed to terminate** Murat Polar, Rachel Houghton, Chassity Plummer-Long, Pamela Johnson, and Rebecca Trivett as defendants in this action.

**SO ORDERED.**

Date: 9/22/2021

*[signature]*

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Harry Harrison, #875139
PLAINFIELD CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Adrienne Nicole Pope
INDIANA ATTORNEY GENERAL'S OFFICE
adrienne.pope@atg.in.gov